UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MEGAN SCHULTZ, individually and on behalf of all others similarly situated,<br><br>                         Plaintiff,<br><br>     v.<br><br>CVS HEALTH CORPORATION,<br><br>                        Defendant. | CASE NO.<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................1

II.  JURISDICTION AND VENUE ........................................................................6

III.  PARTIES ...........................................................................................................6

    A.  Plaintiff ....................................................................................................6

    B.  Defendant ................................................................................................8

II.  FACTUAL ALLEGATIONS ............................................................................8

    A.  CVS makes money and gets more business by agreeing with PBMs to defraud its customers. .............................................................................8

    B.  CVS falsely represented that it would offer customers the lowest prices..............14

    C.  CVS is a fiduciary under ERISA. .........................................................17

IV.  TOLLING OF THE STATUTE OF LIMITATIONS.......................................21

    A.  The Statute of Limitations is tolled because Class members could not have reasonably discovered the secret scheme................................................21

    B.  The Statute of Limitations is tolled because CVS fraudulently concealed the scheme.............................................................................22

    C.  CVS, by its failure to disclose the scheme, is estopped from relying on any Statute of Limitations.............................................................................22

V.  CLASS ALLEGATIONS .................................................................................22

    A.  Claims Brought on Behalf of the RICO Class ......................................25

COUNT I  VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(C)) ............................................25

        1.  CVS played a crucial role in the Overpayment Enterprise and Individual Overpayment Enterprises. ........................................26

        2.  CVS actively conducted and directed affairs of the Overpayment Enterprise and Individual Overpayment Enterprises. ...............28

        3.  CVS engaged in racketeering activity by committing mail and wire fraud. .........................................................................................29

4.      CVS engaged in a pattern of racketeering by continually defrauding customers. ...............................................................32

5.      CVS proximately caused the RICO Class's damages................................33

COUNT II  VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(D))..............................................34

B.      Claims Brought on Behalf of the ERISA Subclass................................35

COUNT I  ENFORCEMENT OF RIGHTS  UNDER HEALTH CARE PLAN (29 U.S.C. 1132(A)(1)(B))..............................................................................................35

COUNT II  FIDUCIARY CONFLICTS OF INTEREST (29 U.S.C. § 1132(A)(3))....................36

COUNT III  LACK OF ADEQUATE CARE (29 U.S.C. § 1104(A)(1))....................................37

C.      Claims Brought on Behalf of the California Subclass ...........................38

COUNT I  VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*) ........................................38

COUNT II  VIOLATIONS OF THE CALIFORNIA CONSUMER  LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750 *ET SEQ.*) .......................................................40

COUNT III  FRAUDULENT CONCEALMENT (BASED ON CALIFORNIA LAW) .............43

Plaintiff Megan Schultz, individually and on behalf of all others similarly situated, alleges as follows:

## I.      INTRODUCTION

1.      Pharmacists are on the front lines of America's health care system. Customers rely on their advice and guidance in buying their prescription medications. And when customers use health insurance to make these purchases from their pharmacists, they naturally believe that they are paying the lowest out-of-pocket payments for which they are eligible under the terms of their health care plans.

2.      Defendant CVS Health Corporation (CVS) leverages its position on the front lines to earn substantial profits from selling prescription drugs—about $10.3 billion annually[1]—yet it assures its customers that it is committed to offering affordable medicine. CVS recently announced that "[w]e're committed to bringing accessible and affordable care to as many people as we can. It's the right thing to do – and for the largest pharmacy health care provider in the U.S., it's also a strategy for long-term growth." *Id*. at 18. CVS also recognized that "[w]hen it comes to health care, there's a clear connection between convenience, access and outcomes. For patients with busy lives, tight budgets or mobility challenges, any roadblock to obtaining an important screening or treatment can lead to a cascade of undesired effects." *Id*. at 22.

3.      But CVS's customers are not getting "affordable care" because CVS has participated in a fraudulent scheme to overcharge for certain generic pharmaceuticals (the "Affected Drugs")[2] in two main respects. First, CVS deliberately charges customers who use their insurance *more* for the Affected Drugs as compared to customers who pay cash or simply

---

[1] CVS Corporate Social Responsibility Report (2016) at 5-6, available at https://www.cvshealth.com/sites/default/files/2016-csr-report.pdf.

[2] "Affected Drugs" is further defined *infra* at n.23.

- 1 -

don't use their insurance. Randal Johnson, the President of the Louisiana Independent Pharmacies Associated, explained that "it's actually costing you more to acquire the drug with your insurance than you could if you walked in off the street and you didn't have insurance[.]"[3]

4.     Plaintiff Megan Schultz is one of those customers. On July 6, 2017, she used her insurance to purchase a certain generic drug[4] at her local CVS, and under her plan she was required to pay $165.68. But if she simply paid in cash, without using her insurance, she would have paid only $92. CVS never told her that paying in cash would allow her to pay 45% less for the drug; instead, CVS remained silent and took her money—knowing full well that no reasonable consumer would make such a choice.

5.     CVS's silence results from its participation in a fraudulent scheme with several large Pharmacy Benefit Managers (PBMs) who act as an intermediary between insurance companies and pharmacies. PBMs use their marketing leverage with pharmacies to negotiate prices that the insurance companies have to pay the pharmacies. Pharmacies, in turn, get the benefit of having enrollees in the insurance plan coming to their stores to get their prescriptions filled if the pharmacy is in the PBM's network. As a result, CVS is eager to reach agreements with PBMs that will drive more people to the stores, where customers often purchase more than their generic drugs.[5] These agreements with PBMs are based on secret, undisclosed contracts, under which CVS agrees to specific amounts it will charge and collect from insured customers—

---

[3] Lee Zurik, *Copay or you-pay? Prescription drug clawbacks draw fire*, Fox 8 (May 4, 2016), http://www.fox8live.com/story/31891070/zurik-copay-or-you-pay-prescription-drug-clawbacks-draw-fire.

[4] To protect Plaintiff's privacy, the names of the specific drugs she purchased are not identified in the Complaint. If necessary to resolve a motion to dismiss, counsel will provide this information under seal pursuant to a Protective Order.

[5] *See* Samantha Timmermann, *Pharmacy Marketing & Sales: How to Increase Profits by Thousands of Dollars a Year*, Pharmacy Development Services (Aug. 15, 2011), https://www.pharmacyowners.com/blog/bid/60345/pharmacy-marketing-sales-how-to-increase-profits-by-thousands-of-dollars-a-year.

but the customers can neither see nor learn about these agreements or their terms from the pharmacies, the insurance companies, or anyone else. The linchpin of the scheme is that the consumer pays the amount negotiated between the PBM and CVS even if that amount exceeds the price of the drug without insurance.

6.      The second prong of CVS's scheme involves overcharging customers by collecting "co-pays" that, unbeknownst to the customers, exceed the pharmacists' price and profit. CVS then remits the excess payments back to the PBMs. In the industry, these payments are often called "clawback" or spread payments. The spread is calculated based on what the customer paid, less the amount due to the pharmacists. Although the customers are told, for example, that they are required to pay $15 in a "co-pay" for the drug, in reality this is not a "co-pay" at all because CVS is sending a significant portion of the $15 back to the PBMs. The PBMs, far from assisting with the payments, are taking an extra chunk out of the customer's copayment.

7.     The following illustration depicts how funds are clawed back to the PBMs: [6]

**Clawbacks Work Like This:**

 

**1.** Customer is prescribed 40 milligrams of the stomach medicine pantoprazole.

**2.** The pharmacy benefit manager has helped negotiate a $15 co-payment for generic pantoprazole. The medicine costs the pharmacist $2.05.

**3.** The pharmacist is reimbursed $7.22, giving him a profit of $5.17.

**4.** The benefit manager "claws back" $7.78 from the pharmacy.

$15 → $7.22 -2.05 $5.17 → $7.78

8.     Another example is the payment by Plaintiff Megan Schultz. She paid $101.49 for a certain drug at CVS when the cash price was $49.45. Ms. Schultz, as would any reasonable consumer, assumed that her insurance company would be paying approximately $400 if $101.49 was a standard 20% co-pay. Not so. Her insurance company paid less than her entire payment as a result of the secret agreements between the PBMs and CVS. One PBM, OptumRx, calls this practice a part of "OptumRx's Pharmacy Reimbursement Overpayment" program.

9.     The National Community Pharmacists Association (NCPA) surveyed hundreds of its member pharmacists and found that clawbacks are a common practice.[7] According to the

---

[6] *See* Jared S. Hopkins, *You're Overpaying for Drugs and Your Pharmacist Can't Tell You*, Bloomberg (Feb. 24, 2017), https://www.bloomberg.com/news/articles/2017-02-24/sworn-to-secrecy-drugstores-stay-silent-as-customers-overpay.

[7] *See, e.g.*, *Pharmacists Survey: Prescription Drug Costs Skewed by Hidden Fees on Pharmacies, Patients*, PR Newswire (June 28, 2016), http://www.prnewswire.com/news-releases/pharmacists-survey-prescription-drug-costs-skewed-by-hidden-fees-on-pharmacies-patients-300291396.html.

CEO of the NCPA, B. Douglas Hoey, "[p]atients purchase insurance with the presumption that they will save money using the plan's designated health care providers . . . . Copay clawbacks turn that logic on its head. A copay becomes a full pay—and then some." *Id.*

10.     When confronted with evidence regarding this fraudulent scheme, pharmacies typically paint themselves as the victim, claiming that they were forced to engage in what is admittedly deceitful conduct because they signed contracts with PBMs—as if a contract gives them license to defraud. A local television station in New Orleans ran a series of stories about this practice, with pharmacists interviewed in the dark with voice distorters as they detailed the scheme.[8] The NCPA CEO said that "[f]rom an ethical standpoint, it sure feels unethical[.] And as a pharmacist wanting the patient to be healthy and get the best value for their medication, everything about it feels wrong." *Id.*

11.     But individual pharmacists' misgivings about the scheme only serve to highlight its wrongfulness, because CVS, motivated by profit, deliberately entered into these contracts, dedicating itself to the secret scheme that kept customers in the dark about the true price of the Affected Drugs. It has even recognized in a recently filed annual report to the Securities and Exchange Commission that regulation of these secret agreements could harm its bottom line.[9]

12.     But the law requires more of CVS than the simple pursuit of profits at the expense of their customers. Under the Employee Retirement Income Security Act of 174 (ERISA), entities like CVS that control assets of health plan enrollees have a fiduciary duty to those individuals. As a fiduciary, CVS has an obligation to provide its services "solely in the interest of

---

[8] *See* Lee Zurik, *Pharmacists, customers nationwide copying with clawbacks*, Fox 8 (May 16, 2016), http://www.fox8live.com/story/31985650/zurik-pharmacists-customers-nationwide-coping-with-clawbacks.

[9] *See* CVS's 2016 10-K Annual Report at 15, available at http://otp.investis.com/clients/us/cvs_caremark1/SEC/sec-show.aspx?Type=html&FilingId=11837374&CIK=0000064803&Index=10000.

the participants and beneficiaries," and an obligation to "defray[] reasonable expenses of administering the plan." 29 U.S.C. § 1104(a). CVS's involvement in the clawback scheme is a direct violation of these responsibilities and CVS is enabling co-fiduciaries to violate their own duties and responsibilities as well.

13.     Plaintiff Megan Schultz and the proposed Class and Subclasses ("Class") are insureds who overpaid for the Affected Drugs and who seek relief for CVS's violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* (RICO); ERISA, 29 U.S.C. § 1001 *et seq.*; state consumer protection laws; and common law fraud.

## II.      JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) because the Class consists of more than 100 members, the amount in controversy exceeds the sum or value of five million dollars ($5,000,000) exclusive of recoverable interest and costs, and minimal diversity exists. This Court also has subject matter jurisdiction pursuant to 18 U.S.C. § 1964 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because CVS has its principal place of business within this District.

## III.      PARTIES

**A.      Plaintiff**

16.     Plaintiff Megan Schultz is a resident of Kentfield, California, and was a participant in a health care plan with medical and pharmacy coverage administered by Anthem Blue Cross. Plaintiff routinely purchased certain generic pharmaceuticals at her local CVS using her insurance plan, but she would have paid less if CVS charged her the cash price. Below is a

chart summarizing Plaintiff's purchases of certain Affected Drugs as well as the stated cash price

based on a leading website that reports this information—GoodRx:[10]

| Drug | Date of Purchase | Prescription Price | Cash Price | Overpayment |
|---|---|---|---|---|
| **Drug 1** | 07/06/16 | $98.65 | $43 (as of 7/8/16)[11] | $55.65 |
| | 08/07/16 | $58.43 | $52[12] | $6.43 |
| **Drug 2** | 01/28/17 | $15.60 | $15 (as of 1/29/17)[13] | $.60 |
| | 03/01/17 | $15.60 | $15 (as of 3/4/17)[14] | $.60 |
| | 04/08/17 | $15.60 | $15 (as of 3/30/17)[15] | $.60 |
| | 05/08/17 | $15.60 | $15 (as of 3/30/17)[16] | $.60 |
| | 06/08/17 | $16.15 | $15 (as of 7/12/17)[17] | $1.15 |
| | 07/08/17 | $16.75 | $15 (as of 7/12/17)[18] | $1.75 |
| **Drug 3** | 07/06/17 | $101.49 | $54 (as of 7/26/17)[19] | $47.49 |
| **Drug 4** | 06/27/17 | $165.68 | $92[20] | $73.68 |

17.     At no point did CVS ever advise Plaintiff that the cash price was less than her

insurance price. Nor did CVS ever advise her that CVS had agreed to pay back to the PBM a

spread based on what she paid, less the price to the pharmacy. Nor did CVS ever tell her that it

agreed to remain silent about these fraudulent practices or that it was unable to advise her as a

---

[10] GoodRx is an online website for generic drugs that Consumer Reports describes as the "best at finding the lowest prices in stores and online." *See* http://www.consumerreports.org/ cro/2012/05/can-a-phone-app-help-you-find-cheaper-drugs/index.htm. According to its website, "GoodRx's cash prices are based on multiple sources, including published price lists, purchases, claims records, and data provided by pharmacies." *See* https://www.goodrx.com/levothyroxine ?form=tablet&dosage=50mcg&quantity=30&label_override=. Historical information regarding cash prices is captured by the *Internet Archive* (web.archive.org), which archives websites at different periods of time so that viewers can see the website as it existed on a given date.

[11] *See* https://web.archive.org/web/20160727174052/http://www.goodrx.com:80/[redacted].

[12] *See* http://web.archive.org/web/20160730183201/http://www.goodrx.com:80/[redacted].

[13] *See* http://web.archive.org/web/20160919215728/http://www.goodrx.com:80/[redacted].

[14] *See* http://web.archive.org/web/20160919215728/http://www.goodrx.com:80/[redacted].

[15] *See* https://web.archive.org/web/20160920181353/http://www.goodrx.com:80/[redacted].

[16] *See* https://web.archive.org/web/20160920181353/http://www.goodrx.com:80/[redacted].

[17] *See* https://web.archive.org/web/20160920181353/http://www.goodrx.com:80/[redacted].

[18] *See* https://web.archive.org/web/20160920181353/http://www.goodrx.com:80/[redacted].

[19] *See* https://www.goodrx.com/[redacted]?drug-name=[redacted].

[20] *See* hhttp://web.archive.org/web/20160508095001/http://www.goodrx.com:80/[redacted].

fiduciary to ensure that she was receiving the best possible health care. Plaintiff reasonably relied

on CVS's representations regarding the price, believing that CVS would be forthright and honest

about what the true price was. Had Plaintiff known that she could have paid the cash price and

saved money, she would have done so.

**B.    Defendant**

18.    Defendant CVS Health Corporation, d/b/a CVS/Caremark, CVS/Pharmacy,

CVS/Minute Clinic, and CVS/Specialty ("CVS") is a Delaware corporation with its principal

place of business at One CVS Drive, Woonsocket, Rhode Island 02895. CVS does business

throughout the United States. It has more than 9,600 retail locations, serving approximately 100

million customers and earning $177.5 billion in revenue annually.[21]

## II.    FACTUAL ALLEGATIONS

**A.    CVS makes money and gets more business by agreeing with PBMs to defraud its customers.**

19.    About 90% of Americans are enrolled in health insurance plans that cover at least

a portion of their medical costs.[22] A crucial component of these plans is the shared cost of

prescription drugs. Indeed, most Americans purchase insurance plans specifically to save money

on their medications.

20.    Cost-sharing generally takes one of three forms: deductible payments,

coinsurance, or copayments. Deductibles set a dollar threshold that a customer must exceed

before the insurer will pay for at least a portion of the medications. Coinsurance requires the

---

[21] CVS Corporate Social Responsibility Report (2016) at 6, available at
https://www.cvshealth.com/sites/default/files/2016-csr-report.pdf.

[22] *See* Chris Isidore, *Nearly 90 Percent of Americans Have Health Insurance*, CNN (Apr. 13,
2015), http://money.cnn.com/2015/04/13/news/economy/obamacare-uninsured-gallup/
index.html.

insured to pay a given percentage of drug costs, often after exceeding the deductible threshold.

Copayments are fixed dollar payments by the insured to pay for their medications.

21.     Insurers hire PBMs to administer the prescription drug components of their health

insurance plans. PBMs process prescriptions for insurers and negotiate with drug manufacturers

and pharmacies to set prices for prescription drugs for insureds. Pursuant to these contracts,

PBMs act as insurers' agents.

22.     The three largest PBMs in the United States are Express Scripts, CVS Caremark

(owned by CVS), and OptumRx, Inc. (collectively, the "Main PBMs"). Together, the Main

PBMs manage the drug benefits for about 75% of the market, or approximately 180 million

patients. Each of these PBMs has a contract with CVS and CVS is part of each PBM's network.

CVS has also contracted with MedImpact, another PBM, and is on MedImpact's network as

well. Upon information and belief, CVS has entered into contracts with each of these PBMs to

engage in the fraudulent scheme alleged herein. Upon information and belief, and during all

relevant times herein, each of the PBMs was aware that it was part of a larger structure serving

the common purpose of defrauding customers and increasing profits by secretly contracting with

CVS to receive clawback payments. All of the PBMs contributed to this scheme by at least

impliedly agreeing that they would not disclose the other PBMs' clawback agreements so that

they could continue to benefit from their own clawback agreement with CVS.

23.     The price customers pay for their medications is governed by a series of contracts

up and down the chain. The insured has an agreement with an insurance company. The insurance

company has an agreement with a PBM to help administer the prescription drug coverage that

the insured purchased through her plan. PBMs enter into agreements with pharmacies to sell the

medications and, critical to this Complaint, collect payment from the customers. Finally, the

pharmacies have contracts with the drug manufacturers (or wholesalers) to supply the

medications. Pharmacies are at the epicenter of this network, as the following diagram illustrates:



24.     On information and belief, CVS has secret, undisclosed written contracts with the

Main PBMs and other PBMs as well. Under these contracts, PBMs set the specific amounts CVS

will charge and collect from insureds for particular drugs, as well as the amounts it will

contribute toward the cost of prescription drugs.[23] On information and belief, all of these

contracts contain confidentiality provisions.

---

[23] The "Affected Drugs" include Accu-Chek, Acyclovir, Aktob, Albuterol, Alocril, Alprazolam, Amiodarone, Amitriptyline, Amlodipine, Amoxicillin, Amphetamine, Anastrozole, Atenolol, Atorvastatin, Azelastine, Azithromycin, Bactrim, Benazepril, Benzonatate, Betamethasone, Buspirone, Bystolic, Carvedilol, Cefadroxil, Cefdinir, Cephalexin, Cetirizine, Ciprofloxacn, Citalopram, Clindamycin and Benzoyl Peroxide, Clindamycin, Clonazepam, Clonidine, Clopidogrel, Cyanocobalam, Cyclobenzaprine, Cytomel, Denta, Depo-Testosterone, Diazepam, Dicyclomine, Diltiazem, Doxazosin, Doxycycl, Duloxetine, Enalapril, Escitalopram, Estradiol, Eszopiclone, Feosol, Ferrous, Flonase, Fluconazole, Fluocinonide, Fluoxetine, Fluticasone, Folbee, Folic, Furosemide, Gabapentin, Gemfibrozil, Gentamicin, Gianvi, Glimepiride, Glipizide, Guaifenesin, Hydrochlorot, Hydrocodone/APAP, Hydroxyz, Ibuprofen, Indomethacin, Invokamet, Irbesartan, Isosorbide, Januvia, Lamotrigine, Lantus, Latanoprost, Levetiraceta, Levocetirizi, Levofloxacin, Levothyroxine, Lexapro, Lisinopril And

25.     Because of the restrictive and confidential nature of the contracts between insurers and PBMs and between PBMs and CVS, CVS's insured customers do not know—and cannot readily discover—that, in many cases, they are paying far more for their prescription drugs by using their insurance benefits than if they simply chose to pay the "cash price" CVS charges uninsured customers, either by paying "copayments" or "coinsurance," or payments applied toward a deductible.

26.     Under the PBM/CVS agreements, the parties agree that CVS will collect payments from customers, which routinely exceed the amount due to CVS, and then remit back the difference (or the spread) to the PBMs. In many of these agreements, CVS pledges to not inform clients that they could pay less if they did not use their insurance plans. In deductible and coinsurance plans, pharmacies agree to collect a percentage of a specified dollar amount (like $10, for example), rather than a percentage of the cost to the pharmacy.

27.     For example, one of the PBMs used by CVS is OptumRx.[24] Although counsel does not yet have the contract between OptumRx and CVS, OptumRx publishes a Provider Manual that details what pharmacies have agreed to do in order to benefit from being an

---

Hydrochlorothiazide, Lisinopril, Lisinopril/hydrochlorothiazide, Lithium, Loratadine, Lorazepam, Losartan, Losartan and Hydrochlorothiazide, Lovastatin, Meloxicam, Memantine, Metformin, Methocarbam, Methylphenidate, Metolazone, Metoprolol, Metronidazol, Minivelle, Mirtazapine, Mometasone, Montelukast, Mupirocin, Naproxen, Nitrofurantoin, Nortriptylin, Nystatin, Omeprazole, Ondansetron, Oxcarbazepin, Oxybutynin, Oxycodone/APAP, Pantoprazole, Paroxetine, Penicillin, Percocet, Pramipexole, Pravastatin, Prednisone, Prednisolone, Promethazine/Codeine, Ramipril, Ranitidine, Restasis, Sertraline, Simvastatin, Singulair, SMZ/TMP, Sodium Chloride (1 gm), Spironolactone, Sprintec, Sulfameth/Trimeth, Sumatriptan, Suprep, Synthroid, Tamiflu, Tamsulosin, Temazepam, Terazosin, Terbinafine, Tizanidine, Tobramycin/Sus Dexameth, Topiramate, Tramadol, Tranex, Trazodone, Tretinoin, Triamcinolone, Triamterene and Hydrochlorothiazide, Vagifem, Valacyclovir, Valsartan/hydrochlorothiazide, Valsartan, Vaniqa, Venlafaxine, Ventolin, Viagra, Vigamox, Vitamin D, Vyvanse, Warfarin, Xopenex, Zaleplon, and Zolpidem.

[24] *See OptumRx and CVS Pharmacy partner to expand consumer choice, reduce costs and improve Health Outcomes*, CVS Health (Nov. 29, 2016), https://cvshealth.com/newsroom/press-releases/optumrx-and-cvs-pharmacy-partner-expand-consumer-choice-reduce-costs-and.

OptumRx distributor. The Provider Manual states that pharmacies "shall collect the full Cost-Sharing Amounts"—*e.g.*, copayments and deductibles—from customers, and pharmacies "must charge . . . the Cost-Sharing Amount indicated in [OptumRx's] online response and only this amount."[25] The pharmacies risk expulsion from OptumRx's network if they disclose reimbursement pricing information or payments to the pharmacies, or if they collect any payment from a patient that differs from the amount specified by OptumRx.[26]

28.     CVS participates in this scheme for two main reasons. First, CVS wants more pharmacy customers, both for its own sake and because pharmacy customers buy additional products at CVS. Helena Foulkes, the CVS/Pharmacy President, recently stated that "the important challenge for us is to drive profitable growth and continue to attract new pharmacy patients."[27] And key to attracting new pharmacy patients are the PBMs. As CVS's 2016 Annual Report stated, "[t]he success of our retail drugstore and long-term care businesses is dependent upon our ability to establish and maintain contractual relationships with pharmacy benefit managers and other payors on acceptable terms."[28] The generic drug business is particularly profitable for pharmacies; by one estimate, they earn a 43% profit margin on generic drugs (compared to 4% for brand name drugs).[29]

---

[25] OptumRx 2017 Provider Manual at 15, 58, available at https://learn.optumrx.com/content/dam/orx-rxmicros/pharmacy-manual/2017_pharmacy_manual.pdf.

[26] *Id.* at 105-106.

[27] *See 7 ways CVS is driving growth in its stores*, Chain Store Age (Dec. 16, 2015), http://www.chainstoreage.com/article/-ways-cvs-driving-growth-its-stores.

[28] *See* CVS's 2016 10-K Annual Report at 9, available at http://otp.investis.com/clients/us/cvs_caremark1/SEC/sec-show.aspx?Type=html&FilingId=11837374&CIK=0000064803&Index=10000.

[29] *See* Neeraj Sood, *Follow the Money: the flow of funds in the pharmaceutical distribution system*, USC Schaeffer Center for Health Policy & Economics, https://www.brookings.edu/wp-content/uploads/2017/05/paper-1-sood-brand-rx-transparency.pdf, at 12.

29.     Second, CVS participates in this scheme because it earns *more* when it charges customers the insurance price. NCPA conducted a study regarding clawbacks and, although it was undoubtedly intending to burnish its own image, it inadvertently proved that pharmacies make *more* money when customers use insurance. The following are pharmacists' statements in the survey:

- "*Got one [clawback] today. [PBM] charging a patient $125 for a generic drug and take back $65 from the pharmacy. If paid cash the cost to the patient would have been $55.*" In other words, the pharmacy would have made $60 from the clawback ($125 - $65 = $60) as compared to $55 for cash payment.

- "*A patient copay is over $50 and the claw back is over $30 all for a drug where our cash price would only be $15.*" Again, the pharmacy earns only $15 when the customer pays the cash price, but $20 if the customer uses insurance.

30.     CVS has acknowledged that changes to a PBM's ability to obtain a spread in the purchase of pharmaceutical products could hurt CVS's business. As it stated in its 2016 Annual Report, "[m]arket dynamics and regulatory changes have impacted our ability to offer plan sponsors pricing that includes the use of retail 'differential' or 'spread,' which could negatively impact our future profitability. Further, changes in existing federal or state laws or regulations or the adoption of new laws or regulations relating to patent term extensions, purchase discount and rebate arrangements with pharmaceutical manufacturers, or to formulary management or other PBM services could also reduce the discounts or rebates we receive."[30]

---

[30] *See* CVS's 2016 10-K Annual Report at 15, available at http://otp.investis.com/clients/us/ cvs_caremark1/SEC/sec-show.aspx?Type=html&FilingId=11837374&CIK=0000064803&Index =10000.

010698-11 975397 V1

31.     But because of the secret contracts and their confidentiality provisions, retail

pharmacies conceal the profits and "clawbacks" from insureds and do not tell customers that they

would benefit from paying a lower cash price for medication rather than using their prescription

drug coverage.[31] As a result, Plaintiff and Class members are systematically deceived into

believing that they are paying the lowest dollar amount for the product when in fact they are

being overcharged.

32.     On information and belief, Anthem and its PBM, Express Scripts, Inc., have a

written contract that contains the terms under which Express Scripts administers the prescription

drug benefit component of Anthem's health insurance plans. Pursuant to this contract, Express

Scripts acts as Anthem's agent because it is acting on Anthem's behalf in negotiating drug prices

pursuant to Anthem's conditions and stipulations. On information and belief, CVS has a secret,

undisclosed written contract with Anthem's agent, Express Scripts, and, ostensibly pursuant to

the terms of this contract, CVS concealed from Ms. Schultz the lower out-of-pocket amounts

available to her for the same quantities of her prescribed medications that would be charged if

she did not use her Anthem prescription drug coverage for the transactions. On further

information and belief, CVS has secret, undisclosed written contracts with all other major PBMs,

which it uses to justify concealing lower available out-of-pocket amounts to hundreds of

thousands, if not millions, of other customers.

**B.     CVS falsely represented that it would offer customers the lowest prices.**

33.     Customers like Plaintiff Schultz have particular confidence in CVS to charge

customers the lowest price and to disclose the fact that cash payments are cheaper, because CVS

---

[31] *Id.*; *see also Medical Waste: Lee Zurik Investigates the Rising Costs of Prescription Meds and Questionable Practices by The Pharmaceutical and Insurance Industries*, Fox 8 http://www.fox8live.com/category/314285/medical-waste-a-lee-zurik-investigation (last accessed Mar. 7, 2017).

promotes itself as being committed to its customers' health and well-being, including by selling drugs at affordable prices.

34.     CVS recognizes that an increase in pharmaceutical costs harms patients. Its Corporate Social Responsibility [CSR] Report acknowledges that 21% of Americans "put off filling a prescription due to affordability concerns in 2016."[32] It also conceded that, "[w]hen it comes to health care, there's a clear connection between convenience, access and outcomes. For patients with busy lives, tight budgets or mobility challenges, any roadblock to obtaining an important screening or treatment can lead to a cascade of undesired effects."[33]

35.     If high drug costs are the problem, CVS promotes itself as the solution. On its "Social Responsibility" webpage, CVS proclaims that "[o]ur approach to social responsibility ties directly to our purpose: Helping people on their path to better health."[34] Under a "Corporate Social Responsibility heading, CVS states: "Our CSR strategy, *Prescription for a Better World* focuses on making quality health care more affordable, more accessible and more sustainable." *Id.* The CVS Corporate Social Responsibility Report also promises that "[a]t the heart of our purpose is our commitment to supporting the communities we serve. Whether we're helping underserved patients or communities, making prescription drugs more affordable, or educating patients about the health care system, our commitment to accessible and affordable care goes well beyond the walls of our stores."[35]

---

[32] CVS Corporate Social Responsibility Report (2016) at 19, available at https://www.cvshealth.com/sites/default/files/2016-csr-report.pdf.

[33] *Id.* at 22.

[34] *See Social Responsibility*, CVS Health, https://www.cvshealth.com/social-responsibility (last accessed Aug. 7, 2017).

[35] CVS Corporate Social Responsibility Report (2016) at 23, available at https://www.cvshealth.com/sites/default/files/2016-csr-report.pdf.

010698-11 975397 V1

36.     CVS's Corporate Social Responsibility Report states at the beginning that "CVS Health is a pharmacy innovation company with a clear purpose – helping people on their path to better health. We aim to accomplish this by addressing critical health care issues and maintaining our focus on delivering affordable, accessible and effective health care." *Id.* at 2. The report also makes the following representations about its "values":

- "Our work in Health in Action has made health care more affordable and accessible." *Id.* at 3.

- "We are committed to making health care more affordable and accessible, using resources efficiently, and operating our business with integrity." *Id.* at 12.

- "We reach more than 100 million people each year, and continue to innovate to make health care products and services increasingly accessible and affordable for more people." *Id.* at 13.

- "[We] can help [our customers] navigate their health challenges in a variety of ways. These include helping to ensure that care is more accessible and more affordable for more people." *Id.* at 16.

- "We're committed to bringing accessible and affordable care to as many people as we can. It's the right thing to do – and for the largest pharmacy health care provider in the U.S., it's also a strategy for long-term growth." *Id.* at 18.

- "CVS Health uses its size, scale and expertise to introduce cost management strategies that enable us to negotiate better prices and bring down costs for our patients, clients and plan members." *Id.* at 27.

- "Today's patients confront a dauntingly complex health care system in which the wrong decision can have a lasting impact on their health or health care spending.

CVS Health is committed to educating patients about this system and helping them make informed decisions." *Id.* at 27.

37.     Contrary to these public representations, CVS is not "committed to educating patients" about their health care spending or "helping them make informed decisions," nor is it "committed to making health care more affordable and accessible," "making prescription drugs more affordable," or "committed to bringing accessible and affordable care to as many people as we can." And it entered into this fraudulent scheme despite its own recognition that wrong decisions can have a "lasting impact" on customers' health care spending, that *21%* of Americans in 2016 "put off filling a prescription due to affordability concerns," and that "any roadblock" to treatment, including tight budgets, "can lead to a cascade of undesired effects." Undoubtedly true—but CVS persisted with its plan to overcharge its customers.

## C.     CVS is a fiduciary under ERISA.

38.     The ERISA Subclass (defined below) members are participants in employee welfare benefit plans pursuant to 19 U.S.C. § 1002(1)(A), administered by PBMs to provide participants with medical care and prescription medications ("ERISA Plans").

39.     Under ERISA, persons are fiduciaries if they perform any fiduciary function. A person is a fiduciary to the extent:

> (i) he [or she] exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he [or she] renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he [or she] has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

40.     At all times relevant herein, CVS was a fiduciary under ERISA because it exercised authority and control over disposition of the assets of the health care plans based on its role in collecting payments from customers and remitting a portion of it back to the PBMs. The copayments, coinsurance, and deductible payments CVS collected from participants and beneficiaries are "plan assets" under ERISA. CVS also acted as a fiduciary in exercising discretionary authority, control, and responsibility regarding the management and administration of such plan, including whether to charge a customer the cash price or the insurer's price.

41.     The pharmacies were well aware of their participation in this scheme, including their control over the assets of the plan, as the computer system they used instantly showed the flow of funds at the Point of Sale:



42.     This screenshot of a pharmacist's computer, in the bottom right-hand corner, shows the "copay" of $10, the total fees paid to the pharmacy ($7.23), and the spread of $2.77 "remitted" back to the PBM.

010698-11 975397 V1

43.     A fiduciary has a strict duty to serve the plan fiduciaries. Under § 404(a) of

ERISA (29 U.S.C. § 1104(a)(1)):

> [A] fiduciary shall discharge his duties with respect to a plan solely
> in the interest of the participants and beneficiaries and . . . for the
> exclusive purpose of: (i) providing benefits to participants and
> their beneficiaries; and (ii) defraying reasonable expenses of
> administering the plan; . . . with the care, skill, prudence, and
> diligence under the circumstances then prevailing that a prudent
> man acting in a like capacity and familiar with such matters would
> use in the conduct of an enterprise of a like character and with like
> aims[.]

44.     CVS breached its duty of loyalty by entering into agreements with PBMs that

created a blatant conflict of interest, in that CVS agreed to a scheme in which it could not

provide its best advice to its customers. It agreed to overcharge customers for their medications,

many of which customers relied on for maintenance care. It also agreed to keep silent about the

scheme and not provide customers with complete and accurate information about their

medications. Such conduct is in blatant disregard of its responsibilities as a fiduciary.

45.     CVS is also a party in interest because CVS provides services to the insurance

plans in the form of pharmaceutical sales. *See* 29 USC § 1002(14)(B).

46.     Finally, CVS is also a co-fiduciary. Under 29 U.S.C. § 1105, CVS is liable for the

acts of other fiduciaries, as follows:

> In addition to any liability which he may have under any other
> provisions of this part, a fiduciary with respect to a plan shall be
> liable for a breach of fiduciary responsibility of another fiduciary
> with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to
> conceal, an act or omission of such other fiduciary, knowing such
> act or omission is a breach;
>
> (2) if, by his failure to comply with section 1104(a)(1) of this title
> in the administration of his specific responsibilities which give rise
> to his status as a fiduciary, he has enabled such other fiduciary to
> commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

47.     CVS is enabling the scheme by the other fiduciaries to continue, particularly the PBMs. Without CVS's agreement to sell the Affected Drugs at inflated rates, remit the "spread" back to the PBMs, and remain silent about it with the customers, the clawback scheme would never have been successful. CVS fully knew and understood that PBMs act as fiduciaries with respect to customers' health care plans, and CVS enabled the PBMs' breach of their fiduciary duties by their participation in the fraudulent scheme.

48.     In addition, non-fiduciaries—regardless of whether they are parties in interest—who knowingly participate in a fiduciary breach may still be liable under ERISA.[36] Even if CVS is not deemed to be a fiduciary, it still must disgorge unjust profits or fees and is subject to other equitable relief.

49.     CVS maximized their own profits, profits of the PBMs, and profits to third parties at the expense of the ERISA Subclass.

50.     All times relevant herein, the Main PBMs, as well as all other PBMs, were fiduciaries under ERISA because they exercised discretionary authority and discretionary control over management and administration of a health care plan, and exercised authority and control regarding the management and disposition of its assets. The PBMs in particular (a) controlled computations of prescription drug payments and set cost-sharing payments greater than the amounts allowed under the plans; (b) set the amounts of the spread and clawbacks; and

---

[36] 29 U.S.C. § 1132(a)(3) ("A civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .").

(c) exercised authority and control over plan assets, including customers' cost-sharing payments and the contracts with the insurance companies.

## IV.     TOLLING OF THE STATUTE OF LIMITATIONS

**A.     The Statute of Limitations is tolled because Class members could not have reasonably discovered the secret scheme.**

51.     Class members had no way of knowing about CVS's deception with respect to overpayment of the Affected Drugs. Indeed, as detailed above, CVS agreed to keep the scheme secret and to not tell customers about their overpayments.

52.     Within the time period of any applicable statutes of limitation, Plaintiff and members of the proposed classes could not have discovered, through the exercise of reasonable diligence, that CVS was concealing the conduct detailed in this Complaint.

53.     Plaintiff and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that CVS did not report information within its knowledge to its customers or federal and state authorities; nor would a reasonable and diligent investigation have disclosed that CVS had concealed information about the overpayment of the Affected Drugs, which was discovered by Plaintiff only shortly before this action was filed. Nor, in any event, would such an investigation on the part of Plaintiff and other Class members have disclosed that CVS valued profits over their obligation to be truthful with their customers and comply with the law.

54.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

**B.     The Statute of Limitations is tolled because CVS fraudulently concealed the scheme.**

55.     All applicable statutes of limitation have also been tolled by CVS's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

56.     Instead of disclosing their fraudulent scheme, CVS entered into agreements with the PBMs to keep the scheme secret. CVS even voluntarily entered into agreements that provided for retaliatory action if it disclosed the secret scheme to customers. CVS and the PBMs were able to keep the scheme secret from the Class for years.

**C.     CVS, by its failure to disclose the scheme, is estopped from relying on any Statute of Limitations.**

57.     CVS was under a continuous duty to disclose to Plaintiff and the other Class members that it had entered into these secret agreements, that it was not being truthful in making representations about the true cost of the pharmaceutical, that it was paying clawbacks to the PBMs, and that customers' "co-pays" were not co-pays at all, but "all-pays," which an addition sum of money going to CVS and the PBMs. .

58.     CVS knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the fraudulent scheme.

59.     Based on the foregoing, CVS is estopped from relying on any statutes of limitations in defense of this action.

## V.     CLASS ALLEGATIONS

60.     Plaintiff brings this action on behalf of herself and as a class action pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class and subclasses (collectively, the "Classes").

**The RICO Class**

All persons or entities in the United States who, as of August 7, 2017, were participants in or beneficiaries of or insured under a health benefit plan administered by a Pharmacy Benefit Manager, and who bought prescription drugs from CVS pursuant to such plan for a higher price than the amount owed to the pharmacy.

**The ERISA Subclass**

All persons or entities in the United States who, as of August 7, 2017, were participants in or beneficiaries of or insured under a health benefit plan subject to ERISA and administered by a Pharmacy Benefit Manager, and who bought prescription drugs from CVS pursuant to such plan for a higher price than the amount owed to the pharmacy.

**The California Subclass**

All persons or entities in the state of California who, as of August 7, 2017, were participants in or beneficiaries of or insured under a health benefit plan administered by a Pharmacy Benefit Manager, and who bought prescription drugs from CVS pursuant to such plan for a higher price than the amount owed to the pharmacy.

61.     Excluded from the Class are CVS; any parent, subsidiary, or affiliate of CVS or any employees, officers, or directors of CVS; legal representatives, successors, or assigns of CVS; and any justice, judge or magistrate judge of the United States who may hear the case, and all persons related to any such judicial officer, as defined in 28 U.S.C. § 455(b).

62.     Certification of Plaintiff's claims for classwide treatment is appropriate because Plaintiff can prove the elements of her claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

63.     This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

64.     **Numerosity**. The Class is so numerous as to make it impracticable to join all members as plaintiffs. Based upon the investigation of counsel, the number of members of the Class is estimated to be at least, and likely far in excess of, one million persons.

65.   **Commonality and Predominance**. There are questions of law and fact that are common to all members of the Class, which questions predominate over any question affecting only individual members, including:

    a.   Whether CVS entered into secret contracts with the PBMs;

    b.   Whether these secret contracts set a price that CVS had to charge customers;

    c.   Whether these secret contracts mandated that no party could disclose the existence of the terms;

    d.   Whether these contracts resulted in customers paying a higher price when they used their insurance as compared to paying cash;

    e.   Whether these secret contracts required CVS to remit a "clawback" payment to the PBMs;

    f.   Whether CVS is a fiduciary under ERISA; and

    g.   Whether CVS had a duty to disclose the lowest available price to its customers.

66.   The only individual questions concern the computation of damages and/or restitution amounts to be awarded to each Class member, which questions can be determined by a ministerial examination of the relevant files. For notice purposes, members of the Class can be identified using CVS's computerized databases of insureds' records.

67.   **Typicality**. Plaintiff's claims are typical of the claims of all the other members of the Class, because Plaintiff's claims are based on the same legal and remedial theories as the claims of the Class and arise from the same course of conduct by CVS.

68.   **Adequacy**. Plaintiff will fairly and adequately protect the interest of all Class members in the prosecution of this action and in the administration of all matters relating to the claims stated herein. Plaintiff is similarly situated with, and has suffered similar injuries as, the members of the Class she seeks to represent. Plaintiff has retained counsel experienced in

- 24 -

handling class action lawsuits involving RICO and consumer protection claims. Neither Plaintiff nor her counsel have any interest that might cause them not to vigorously pursue this action.

69.     **Declaratory Relief**. CVS has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Classes, thereby making appropriate declaratory relief, with respect to each Class as a whole.

70.     **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of the controversy, in that:

a.     The losses suffered by the Class members are such that prosecution of individual actions is impractical or economically unfeasible;

b.     By contrast, the profits obtained by CVS as a result of its unlawful practices are substantial;

c.     In the absence of the class action device, Plaintiff and the Class would be left without a remedy for the wrongful acts alleged and CVS will be unjustly enriched;

d.     The prosecution of separate lawsuits by individual members of the Class would create the risk of inconsistent adjudications, which would establish incompatible standards of conduct for CVS, making concentration of the litigation concerning this matter in this Court desirable;

e.     The claims of the representative Plaintiff is typical of the claims of the Class; and

f.     No unusual difficulties are likely to be encountered in the management of this action as a class action.

**A.     Claims Brought on Behalf of the RICO Class**

**COUNT I**

**VIOLATIONS OF THE RACKETEER INFLUENCED AND
CORRUPT ORGANIZATIONS ACT
(18 U.S.C. § 1962(C))**

71.     Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein. At all times relevant, defendant CVS was a "person" as described in 18 U.S.C.

§ 1961(3) in that it is a legal entity capable of holding a legal or beneficial interest in real property.

72.     18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

73.     18 U.S.C. § 1962(d), among other provisions, makes it unlawful for "any person to conspire to violate" the RICO statute.

1.     **CVS played a crucial role in the Overpayment Enterprise and Individual Overpayment Enterprises.**

74.     CVS and PBMs, including but not limited to OptumRx, CVS Caremark, Express Scripts, and MedImpact, and each of their employees and agents, constitute an association-in-fact enterprise as described in 18 U.S.C. § 1961(4) (the "Overpayment Enterprise").

75.     CVS also formed separate association-in-fact enterprises (collectively, the "Individual Overpayment Enterprises") as follows:

> **Express Scripts Overpayment Enterprise**
>
> CVS, including its employees and agents; and Express Scripts, including its employees and agents.
>
> **OptumRx Overpayment Enterprise**
>
> CVS, including its employees and agents; and OptumRx, including its employees and agents.
>
> **MedImpact Overpayment Enterprise**
>
> CVS, including its employees and agents; and MedImpact, including its employees and agents.

76.     At all relevant times, the Overpayment Enterprise and Individual Overpayment Enterprises: (a) had an existence separate and distinct from CVS; (b) were separate and distinct

from the pattern of racketeering in which CVS engaged; and (c) were ongoing organizations consisting of legal entities, including CVS and non-defendant parties, and other entities and individuals associated for the common purpose of selling the Affected Drugs at prices higher than the costs to CVS. Each member of the Overpayment Enterprise and Individual Overpayment Enterprises shared in the bounty generated by the enterprise—*i.e.*, by sharing the benefit derived from inflated prices and by bringing more customers into CVS stores.

77. The constituent members of the association-in-fact Overpayment Enterprise and Individual Overpayment Enterprises functioned as a continuing unit and had the requisite structural features as mandated by *Boyle v. United States*, 556 U.S. 938 (2009). First, they had a purpose, as members worked together to defraud customers who purchased their prescriptions at CVS through entering into secret arrangements so that CVS would receive reimbursements and make a larger profit from individuals using their insurance, while the PBMs would also receive a profit in the form of a "clawback" paid from CVS, also pursuant to secret undisclosed contracts between CVS and the PBM.

78. Second, there were relationships among those associated with the Overpayment Enterprise and Individual Overpayment Enterprises as members worked together to perpetuate the fraud. The scheme would only work with the involvement of both CVS and the insurer/PBM working together, all pursuant to secret, undisclosed contracts that defrauded Plaintiff and the RICO Class. CVS shared profits with the PBMs pursuant to these undisclosed agreements and acted in concert with the insurers/PBMs to coordinate the sharing of profits. Neither CVS nor the Insurers and their PBMs individually could have accomplished the scheme without working together to coordinate the fraudulent scheme, which included sharing the fruits of their scheme pursuant to the secret contracts.

- 27 -

79.     During all relevant times herein, each of the PBMs was aware that it was part of a larger structure serving the common purpose of defrauding customers and increasing profits by secretly contracting with CVS to receive clawback payments. All of the PBMs contributed to this scheme by at least impliedly agreeing that they would not disclose the other PBMs' clawback agreements so that they could continue to benefit from their own clawback agreements with CVS.

80.     Lastly, there was longevity as the relationships between the members of the Overpayment Enterprise and Individual Overpayment Enterprises have lasted for several years and continue to the present.

**2.      CVS actively conducted and directed affairs of the Overpayment Enterprise and Individual Overpayment Enterprises.**

81.     Defendant CVS participated in the "operation or management" of the Overpayment Enterprise and Individual Overpayment Enterprises as it was the point-of-contact with defrauded Plaintiff and members of the RICO Class. CVS, though its secret contracts with members of the Overpayment Enterprise and Individual Overpayment Enterprises, received profits and directed the payment of the "clawbacks" to the PBMs. CVS directed the customers to give CVS their insurance information, directed them to provide payment pursuant to the terms of the PBM contracts, collected the payment, and sent payment to the PBMs. CVS and the other members of the Overpayment Enterprise and Individual Overpayment Enterprises would not have been able to defraud Plaintiff and the Class without colluding with each other. As a result, CVS had direction in conducting and operating in the affairs of the association-in-fact Overpayment Enterprise and Individual Overpayment Enterprises.

### 3.   CVS engaged in racketeering activity by committing mail and wire fraud.

82.     In the District of Rhode Island and elsewhere, from in or about year 2010 and continuing until the present, CVS, a person associated with the Overpayment Enterprise and Individual Overpayment Enterprises, did knowingly and unlawfully conduct or participate, directly or indirectly, in the affairs of the Overpayment Enterprise and Individual Overpayment Enterprises through a pattern of racketeering activity—*i.e.*, acts indictable under 18 U.S.C. §§ 1341 & 1343, all in violation of 18 U.S.C. § 1962(c).

83.     As described in detail in the factual allegations above, CVS did conduct and participate in the Overpayment Enterprise's and Individual Overpayment Enterprises' affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff and the Class. CVS knowingly concealed from customers material information resulting in the systematic deception of Plaintiff and Class members who paid for prescription drugs in amounts greater than they would have otherwise paid, resulting in direct and proximate injury to Plaintiff and Class members.

84.     Specifically, CVS has committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 & 1343) within the past ten years. The multiple acts of racketeering activity that CVS committed and/or aided or abetted in the commission of were related to each other and posed a threat of continued racketeering activity, and they therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by CVS's regular use of the facilities, services, distribution channels, and employees of the Overpayment Enterprise and Individual Overpayment Enterprises. CVS participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailings and wires in interstate or foreign commerce.

85.     In devising and executing the illegal scheme, CVS devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiff and the RICO Class or to obtain money from Plaintiff and the RICO Class by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, CVS committed these racketeering acts intentionally and knowingly with the specific intent to advance the illegal scheme.

86.     CVS's predicate acts of racketeering, 18 U.S.C. § 1961(1), include but are not limited to:

a.     **Mail Fraud**: CVS violated 18 U.S.C. § 1341 by sending and receiving, and by causing to be sent and/or received, materials via U.S. Mail or commercial interstate carriers for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

b.     **Wire Fraud**: CVS violated 18 U.S.C. § 1343 by transmitting and/or receiving, and by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

87.     CVS's use of the mails and wires includes, but is not limited to, the transmission, delivery, and shipment of the following by CVS, other members of the Overpayment Enterprise and Individual Overpayment Enterprises, and third parties that were foreseeably caused to be sent or received as a result of CVS's illegal scheme:

• Every Point of Sale transmission with the PBMs that was sent and received for every purchase at a CVS pharmacy of the Affected Drugs;

• Every remittance of funds wired from CVS to the PBMs;

• Every payment Plaintiff and Class members made by credit or debit cards for their medications;

• Shipment of the Affected Drugs in interstate commerce from the wholesales to CVS; and

- Point of Sale transmissions and remittance of funds between CVS and the PBMs, and Plaintiff's credit or debit card payments, regarding the following purchases of drugs by Plaintiff:

  o **Drug 1**: July 6, 2016 for $98.65; and August 6, 2016 for $58.43.

  o **Drug 2**: January 28, 2017 for $15.60; March 1, 2017 for $15.60; April 8, 2017 for $15.60; May 8, 2017 for $15.60; June 8, 2017 for $16.15; and July 8, 2017 for $16.75.

  o **Drug 3**: July 6, 2017 for $101.49.

  o **Drug 4**: June 27, 2017 for $165.68.

88.     Pursuant to and in furtherance of the fraudulent scheme, on multiple, continuous occasions over the course of several years, CVS used U.S. Mail and the Internet, and made multiple interstate telephone calls to, *inter alia*, communicate and collude with insurers and PBMs to set prices for prescription medications at its retail pharmacies at artificially inflated amounts that resulted in payments to CVS, insurers, and their PBM agents that Plaintiff and the other members of the Class would not otherwise have made. CVS also used U.S. Mail, the Internet, radio, and television to solicit Plaintiff and the other members of the Class to purchase prescription medications at its retail pharmacies.

89.     Many of the precise dates of the fraudulent uses of the U.S. Mail and interstate wire facilities are hidden to the Plaintiff and cannot be alleged without access to CVS's books and records. However, Plaintiff has described the types of predicate acts of mail and/or wire fraud that occurred.

90.     It was and is reasonably foreseeable to CVS (as well as the insurers/PBMs conspirators) that mail, interstate carrier and wire transmissions would be used—and mail, interstate carriers and wire transmissions were in fact used—in furtherance of the scheme.

91.     Pursuant to this systematic system of deception, certain Class members entered into transactions to their economic detriment.

92.     For example, throughout 2016 and 2017, Plaintiff Schultz made a number of prescription drug purchases from CVS pursuant to her Anthem Blue Cross plan. During just this period, she lost at least $187.95 by paying the insurance price and not the cash price.

93.     CVS/Pharmacy has therefore committed multiple instances of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343 continuously over the course of several years.

**4.      CVS engaged in a pattern of racketeering by continually defrauding customers.**

94.     From at least 2010 until the present, CVS engaged in a pattern of racketeering whereby CVS, along with PBMs and insurers, engaged in a scheme to defraud Plaintiff and Class members. CVS, with other members of the Overpayment Enterprise and Individual Overpayment Enterprises, systematically deceived Plaintiff and Class members (pursuant to secret, undisclosed contracts) into believing that Plaintiff and Class members would be receiving the prescribed medications at the lowest cost when in fact they were being overcharged. Plaintiff and Class members could not know that the drugs can be purchased at lower out-of-pocket costs by simply not using insurance coverage for the purchase. This conduct occurred continuously from at least 2010 and continues to this day over the course of tens of thousands of transactions.

95.     Plaintiff alleges that the course of conduct engaged in by CVS constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity as that term is defined in 18 U.S.C. § 1961(5). The predicate acts have the "same or similar purposes, results, participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events." Here, the acts of mail and wire fraud have the same or similar purpose (*i.e.*, to defraud Plaintiff and Class members into paying an excessive amount for prescription drugs), involve the same class of

participants and victims, and are carried out by the same of similar methods of commission (*i.e.*, by concealing the fact that CVS and its conspirators would receive excess profits by having customers use their prescription drug coverage).

96.     Plaintiff alleges that the pattern of racketeering activity constituted closed-ended continuity as these were continuous acts occurring over a substantial period of time—*i.e.*, at least six years. Plaintiff alleges that the pattern of racketeering activity constituted "open-ended" continuity based upon a threat of continuing racketeering activity because the predicate activity itself is continuing and the predicate acts of fraud are the regular way of conducting Defendant's ongoing legitimate business.[37] Because such culpable conduct was part of the regular way of conducting the Defendant's legitimate business, such conduct provides an inference that such offenses will continue indefinitely if not interrupted.

**5.      CVS proximately caused the RICO Class's damages.**

97.     As a result of Defendant's illegal racketeering activities constituting mail and wire fraud, Plaintiff sustained economic damages.

98.     As a direct and proximate result of CVS's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff and Class members have been injured in their business and property in the amounts of the monies they overpaid for prescription medications. CVS aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 & 1343 offenses. CVS is liable to Plaintiff and members of the Class for all of these actual damages caused in an amount to be proved at trial, trebled pursuant to 18 U.S.C. § 1964(c).

---

[37] *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 243 (1989).

## COUNT II

## VIOLATIONS OF THE RACKETEER INFLUENCED AND
## CORRUPT ORGANIZATIONS ACT
## (18 U.S.C. § 1962(D))

99.     Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

100.     Plaintiff alleges that commencing from at least 2010 and continuing until the present, CVS conspired to violate section 18 U.S.C. § 1962(c)—*i.e.*, CVS agreed that the co-conspirators, including CVS, would conduct or participate in the affairs of the Overpayment Enterprise and Individual Overpayment Enterprises through a pattern of racketeering, including acts indictable under 18 U.S.C. §§ 1341 & 1343, as more fully described above in Count I. Plaintiff alleges that the conspiratorial objective of that mutual agreement between CVS and the co-conspirators was intended to obtain Plaintiff's interests in business and/or property and that such conspiratorial conduct violates 18 U.S.C. § 1962(d).

101.     CVS herein agreed with other members of the Overpayment Enterprise and Individual Overpayment Enterprises to engage in a scheme to defraud Plaintiff and Class Members of monies, all pursuant to secret contracts with other members of the Overpayment Enterprise and Individual Overpayment Enterprises. Pursuant to these secret agreements, CVS and the PBMs systematically deceived Plaintiff and Class members into believing that they were paying the lowest cost for their prescription drugs when in fact they were being overcharged. As a result, Defendant agreed with conspirators that it would conduct the affairs of the association-in-fact Overpayment Enterprise and Individual Overpayment Enterprises through a pattern of racketeering, all in violation of 18 U.S.C. § 1962(d).

102.     But for CVS's agreement with conspirators, Plaintiff would not have sustained economic damages.

- 34 -

103. CVS's agreement that it, along with its co-conspirators, would commit illegal racketeering activities—*i.e.*, the effecting of acts of mail and wire fraud—was a direct and proximate cause of Plaintiff's sustained economic damages.

104. As a direct and proximate result of CVS's racketeering activities and violations of 18 U.S.C. § 1962(d), Plaintiff and Class members have been injured in their business and property in the amounts of the monies they overpaid for prescription medications, and CVS is liable to Plaintiff and Class members for all actual damage caused in an amount to be proved at trial, trebled pursuant to 18 U.S.C. § 1964(c).

**B.     Claims Brought on Behalf of the ERISA Subclass**

**COUNT I**

**ENFORCEMENT OF RIGHTS
UNDER HEALTH CARE PLAN
(29 U.S.C. 1132(A)(1)(B))**

105. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

106. ERISA § 502(a)(1)(B) (29 U.S.C. § 1132(a)(1)(B)) provides that a participant or beneficiary may bring an action to enforce her rights under the terms of a plan or clarify her right to future benefits under the plan.

107. As detailed herein, Plaintiff and Class members have been, and will continue to be, denied their rights under their respective plans to be charged a lower amount for their prescriptions. They have been injured in the amount they paid that is in excess of what the pharmacy was due to be paid.

108. Plaintiff and Class members are entitled to enforce their rights under the terms of the plans and clarify their future rights, and accordingly allege that they are entitled to an Order providing (1) that they have been overcharged; (2) an accounting of the charges and overcharges

- 35 -

by CVS and the PBMs; (3) payment of all amount due to them under their plans; and (4) an order enjoining the fraudulent clawback scheme.

## COUNT II

### FIDUCIARY CONFLICTS OF INTEREST
### (29 U.S.C. § 1132(A)(3))

109.    Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

110.    Pursuant to ERISA 406(b) (29 U.S.C. § 1106(b)), a fiduciary with respect to a plan shall not "in [her] individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries."

111.    Pursuant to ERISA § 502(a)(3) (29 U.S.C. § 1132(a)(3)), a participant or beneficiary may bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

112.    As alleged herein, CVS is a fiduciary to the ERISA Plan, and has violated all three of these provisions. CVS has acted on behalf of third party fiduciaries—including but not limited to PBMs—who also stood to profit from the fraudulent clawback scheme at the expense of Plaintiff and Class members. CVS engaged in conflicted transactions each time it facilitated, allowed, or agreed to participate in the clawback scheme because CVS had an obligation to "discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries."

113.    The Court accordingly should order equitable relief to Plaintiff and Class members, including but not limited to (a) an accounting; (b) a surcharge; (c) correction of the transactions; (d) disgorgement of profits; (e) an equitable lien; (f) a constructive trust; (g) restitution; (h) full disclosure of the foregoing acts and practices; (i) an injunction against further violations; and/or (j) any other relief the Court deems proper.

## COUNT III

### LACK OF ADEQUATE CARE
### (29 U.S.C. § 1104(A)(1))

114.    Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

115.    ERISA § 404(a)(1) (29 U.S.C. § 1104(a)(1)) provides as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]

116.    CVS failed to take adequate care by engaging in a fraudulent scheme to overcharge its customers, by failing to inform customers that they would pay less for drugs in many instances if they paid the cash price, and by agreeing to keep the scheme secret so that CVS and the PBMs could continue to overcharge their customers.

117.    The Court accordingly should order equitable relief to Plaintiff and Class members, including but not limited to (a) an accounting; (b) a surcharge; (c) correction of the transactions; (d) disgorgement of profits; (e) an equitable lien; (f) a constructive trust; (g) restitution; (h) full disclosure of the foregoing acts and practices; (i) an injunction against further violations; and/or (j) any other relief the Court deems proper.

010698-11 975397 V1

C.      **Claims Brought on Behalf of the California Subclass**

## COUNT I

### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)

118.    Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

119.    Plaintiff brings this Count on behalf of the California Subclass.

120.    California's Unfair Competition Law (UCL), CAL. BUS. & PROF. CODE § 17200 *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

121.    CVS's conduct, as described herein, was and is in violation of the UCL. CVS's conduct violates the UCL in at least the following ways:

      i.      By failing to disclose the cash price when the cash price was cheaper than the insurance price;

      ii.     By representing to the public that CVS was committed to offering affordable health care, when in fact it was knowingly overcharging for the Affected Drugs;

      iii.    By entering into a fraudulent scheme to remit clawback payments to the PBMs, which was the spread between what the customer paid and what the pharmacy was paid;

      iv.     By representing that a customer's payment was a "co-payment," when in fact it paid the full price of the drug;

      iv.     By agreeing to not disclose the clawback agreement to its customers; and

      v.      By agreeing not to inform the customers when the cash price was cheaper than the insurance price.

122.    CVS intentionally and knowingly misrepresented material facts regarding the prices of the Affected Drugs with an intent to mislead Plaintiff and the Subclass.

123.    In purchasing Affected Drugs from CVS, Plaintiff and Subclass members were deceived by CVS's failure to disclose that the cash price was cheaper than the insurance price;

that it remitted a clawback payment to the PBMs; that the "co-payment" was not in fact a co-payment, but a full payment covering the cost of the drug; that it had agreed not to disclose the clawback agreement to its customers; and by agreeing not to inform customers when the cash price was cheaper than the insurance price.

124.    Plaintiff and Subclass members reasonably relied upon CVS's false misrepresentations. They had no way of knowing that CVS's representations were false and gravely misleading. As alleged herein, CVS engaged in sophisticated methods of deception. Plaintiff and Subclass members did not, and could not, unravel CVS's deception on their own.

125.    CVS knew or should have known that its conduct violated the UCL.

126.    CVS owed Plaintiff and Subclass members a duty to disclose the truth about its scheme because CVS:

      a.      Possessed exclusive knowledge that it was charging customers an inflated price (the insurance price), and was remitting a clawback payment to the PBMs;

      b.      Intentionally concealed the foregoing from Plaintiff and the Subclass;

      c.      Made incomplete representations that the price of the Affected Drugs was a given amount with insurance, while purposefully withholding material facts from Plaintiff and the Subclass that the cash price was actually cheaper; and

      d.      Made incomplete representations that it sought to make pharmaceutical products as affordable as possible, when in fact it knowingly charged inflated prices.

127.    CVS had a duty to disclose that it was charging and collecting a price for customers who used insurance that exceeded the cash price, that customers were not paying a "co-pay," but in fact paying for the whole price of the drug, and that it was paying a "clawback" to the PBMs.

128.    CVS's conduct proximately caused injuries to Plaintiff and Subclass members.

- 39 -

129.   Plaintiff and Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of CVS's conduct in that Plaintiff and Subclass members overpaid for the Affected Drugs, and refrained from filling a prescription based on the price of the Affected Drugs. These injuries are the direct and natural consequence of CVS's misrepresentations and omissions.

130.   CVS's violations present a continuing risk to Plaintiff as well as to the general public. CVS's unlawful acts and practices complained of herein affect the public interest.

131.   CVS's misrepresentations and omissions alleged herein caused Plaintiff and Subclass members to overpay for the Affected Drugs. Absent those misrepresentations and omissions, Plaintiff and Subclass members would have paid less for the Affected Drugs.

132.   Accordingly, Plaintiff and Subclass members have suffered injury in fact, including lost money or property, as a result of CVS's misrepresentations and omissions.

133.   Plaintiff requests that this Court enter such orders or judgments as may be necessary to restore to Plaintiff and members of the Subclass any money it acquired, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. CIV. CODE § 3345, and for such other relief as may be appropriate.

## COUNT II

### VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT
### (CAL. CIV. CODE § 1750 *ET SEQ.*)

134.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

135.   This claim is brought on behalf of the California Subclass.

136.   California's Consumers Legal Remedies Act (CLRA), CAL. CIV. CODE § 1750 *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices

undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

137.    The Affected Drugs are "goods" as defined in CAL. CIV. CODE § 1761(a).

138.    Plaintiff and Subclass members are "consumers" as defined in CAL. CIV. CODE § 1761(d), and Plaintiff, Subclass members, and CVS are "persons" as defined in CAL. CIV. CODE § 1761(c).

139.    CVS's conduct, as described hereinabove, was and is in violation of the CLRA. CVS's conduct violates, at a minimum, CAL. CIV. CODE § 1770(a)(13), because CVS "ma[de] false or misleading statements of fact concerning reasons for, existence of, or amount of, price reductions."

140.    CVS asked customers, including Plaintiff and Subclass members, for their insurance information in order to charge them the insurance price, despite the fact that the cash price was often cheaper than the insurance price for the Affected Drugs. Requesting payment for the Affected Drugs at the insurance price falsely stated or implied that there was no other price for the drugs other than the insurance price.

141.    Plaintiff and Subclass members reasonably relied upon CVS's false misrepresentations. They had no way of knowing that CVS's representations were false and gravely misleading.

142.    CVS knew or should have known that its conduct violated the CLRA.

143.    CVS owed Plaintiff and the Subclass a duty to disclose the truth about the true price of the Affected Drugs because CVS:

       a.    Possessed exclusive knowledge that it was charging customers an inflated price (the insurance price) and was remitting a clawback payment to the PBMs;

       b.    Intentionally concealed the foregoing from Plaintiff and the Subclass;

c.  Falsely represented that the payments for the Affected Drugs were a "co-pay," when in fact the payments covered the full price of the drugs;

d.  Made incomplete representations that the price of the Affected Drugs was a given amount with insurance, while purposefully withholding material facts from Plaintiff and the Subclass that the cash price was actually cheaper; and

e.  Made incomplete representations that it sought to make pharmaceutical products as affordable as possible, when in fact it knowingly charged inflated prices.

144.  CVS had a duty to disclose that it was charging and collecting a price for customers who used insurance that exceeded the cash price, that customers were not paying a "co-pay" but in fact were paying the full price of the drug, and that it was paying a "clawback" to the PBMs.

145.  CVS's conduct proximately caused injuries to Plaintiff and Subclass members.

146.  Plaintiff and Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of CVS's conduct in that Plaintiff and Subclass members overpaid for the Affected Drugs and refrained from filling a prescription based on the price of the Affected Drugs. These injuries are the direct and natural consequence of CVS's misrepresentations and omissions.

147.  CVS's violations present a continuing risk to Plaintiff as well as to the general public. CVS's unlawful acts and practices complained of herein affect the public interest.

148.  CVS's misrepresentations and omissions alleged herein caused Plaintiff and Subclass members to overpay for their Affected Drugs. Absent those misrepresentations and omissions, Plaintiff and Subclass members would have paid less for the Affected Drugs.

149.  Accordingly, Plaintiff and Subclass members have suffered injury in fact, including lost money or property, as a result of CVS's misrepresentations and omissions.

150.     Plaintiff's and Subclass members' injuries were proximately caused by CVS's unlawful and deceptive business practices.

151.     While Plaintiff does not seek to recover damages under the CLRA in this initial Complaint, after mailing appropriate notice and demand in accordance with CAL. CIVIL CODE § 1782(a) & (d), Plaintiff will subsequently amend this Complaint to also include a request for compensatory and punitive damages.

## COUNT III

### FRAUDULENT CONCEALMENT
### (BASED ON CALIFORNIA LAW)

152.     Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

153.     This claim is brought on behalf of the California Subclass.

154.     CVS intentionally misrepresented that it was charging customers a "co-pay" when in fact customers were making full payments for the Affected Drugs and CVS was remitting a clawback payment to the PBMs. CVS also falsely represented that the price of the Affected Drugs was the insurance price, when in fact the cheaper price was the cash price. CVS agreed to keep the agreements with the PBMs confidential and secret so that the customers could never determine that they were paying an inflated price for the Affected Drugs and could have paid less if they paid the cash price, or CVS acted with reckless disregard for the truth and denied Plaintiff and Subclass members information that is highly relevant to their purchasing decision.

155.     CVS further affirmatively misrepresented to Plaintiff and Subclass members in advertising and other forms of communication that CVS was committed to offering drug at the most affordable prices and cared about its customers and their ability to obtain required medications, when in fact CVS had entered into a fraudulent scheme to overcharge its customers.

156.     Defendant knew these representations were false when made.

157.    Defendant had a duty to disclose that the cash prices for the Affected Drugs were often cheaper than payments made through insurance and that Plaintiff and Subclass members were not paying a "co-pay" but instead were paying a "full pay," with CVS remitting an additional clawback payment to the PBMs, because Plaintiff and Subclass members relied on CVS's material representations that the price they were quoted was the most affordable price available.

158.    The truth about the pricing of the Affected Drugs was known only to CVS. Plaintiff and Subclass members did not know of these facts, and CVS actively concealed these facts from Plaintiff and Subclass members.

159.    Plaintiff and Subclass members reasonably relied upon CVS's deception. They had no way of knowing that CVS's representations were false and/or misleading. As consumers, Plaintiff and Subclass members did not, and could not, unravel CVS's deception on their own. Rather, CVS intended to deceive Plaintiff and Subclass members by concealing the true facts about the scheme to inflate prices of the Affected Drugs.

160.    CVS also concealed and suppressed material facts concerning what is evidently the true culture of CVS—a culture characterized by an emphasis on profits and sales above its stated mission to provide customers with affordable medications and its obligation to fulfill its fiduciary duties. CVS also emphasized profits and sales above the trust that Plaintiff and Subclass members placed in their representations.

161.    CVS's false representations were material to customers because they naturally relied on them when deciding how to pay for their medications (or even whether to purchase them at all). If CVS had revealed that customers could simply pay the cash price and save money, they would have readily done so.

- 44 -

162.     CVS had a duty to disclose the scheme to inflate prices of the Affected Drugs because details of the true facts were known and/or accessible only to CVS, because CVS had exclusive knowledge as to such facts, and because CVS knew these facts were not known to or reasonably discoverable by Plaintiff or Subclass members. CVS also had a duty to disclose because it made general affirmative representations about its commitment to provide affordable medications to its customers, with an emphasis on its self-described "mission" to expand affordable health care, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the scheme to inflate generic drug prices. Having volunteered to provide information to Plaintiff and Subclass members about its mission generally, and the prices of Affected Drugs more specifically, CVS had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the price Plaintiff and Subclass members had to pay for the Affected Drugs.

163.     CVS actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect their profits, to continue to be paid more in fees when the customer uses insurance to purchase her drugs, and to keep the scheme secret so as to not be expelled from the PBMs' network. All of which they did at the expense of Plaintiff and Subclass members.

164.     CVS still has not made full and adequate disclosures and continues to defraud Plaintiff and Subclass members by concealing material information regarding the prices of the Affected Drugs.

165.     Plaintiff and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would have not used their insurance to purchase their

medications when the cash price was cheaper. They also may have not purchased their drugs from CVS at all when they found out that CVS had been hiding information from them, getting paid more for insurance payors as opposed to cash payments, and remitting a clawback payment to the PBMs, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Subclass members' actions were justified. CVS and its conspirators were in exclusive control of the material facts and such facts were not generally known to the public, Plaintiff, or Subclass members.

166.    Accordingly, CVS is liable to Plaintiff and Subclass members for damages in an amount to be proven at trial.

167.    CVS's acts were done wantonly, maliciously, oppressively, deliberately with intent to defraud, and in reckless disregard of Plaintiff's and Subclass members' rights and the representations that CVS made to them, in order to enrich CVS. CVS's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Megan Schultz, on behalf of herself and the Class, demands judgment against defendant CVS Health Corporation for the following relief:

A.    An order certifying that this action is properly brought and may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff be appointed as Class Representative, and that Plaintiff's counsel be appointed Class Counsel;

B.    An order temporarily and permanently enjoining CVS from continuing the unlawful, deceptive, fraudulent, and unfair practices alleged in this Complaint;

C.　　　　Costs, restitution, damages, including punitive damages, and disgorgement in an

amount to be determined at trial;

D.　　　　Treble damages and reasonable attorneys' fees and costs;

E.　　　　Pre-judgment and post-judgment interest at the maximum possible rates, whether

at law or in equity; and

F.　　　　Such other relief at law or equity as this court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury for all claims so triable.


Dated: August 7, 2017　　　　　　　　　Respectfully Submitted,

　　　　　　　　　　　　　　　　　　　By: <u>/s/ *Stephen M. Prignano*</u>

　　　　　　　　　　　　　　　　　　　Stephen M. Prignano (3649)
　　　　　　　　　　　　　　　　　　　MCINTYRE TATE LLP
　　　　　　　　　　　　　　　　　　　321 South Main Street, Suite 400
　　　　　　　　　　　　　　　　　　　Providence, Rhode Island 02903
　　　　　　　　　　　　　　　　　　　401.351.7700 (telephone)
　　　　　　　　　　　　　　　　　　　401.331.6095 (facsimile)
　　　　　　　　　　　　　　　　　　　smp@mtlesq.com

　　　　　　　　　　　　　　　　　　　Steve Berman (*pro hac vice* forthcoming)
　　　　　　　　　　　　　　　　　　　Jerrod C. Patterson (*pro hac vice* forthcoming)
　　　　　　　　　　　　　　　　　　　HAGENS BERMAN SOBOL SHAPIRO LLP
　　　　　　　　　　　　　　　　　　　1918 Eighth Avenue, Suite 3300
　　　　　　　　　　　　　　　　　　　Seattle, Washington 98101
　　　　　　　　　　　　　　　　　　　206.623.7292 (telephone)
　　　　　　　　　　　　　　　　　　　206.623.0594 (facsimile)
　　　　　　　　　　　　　　　　　　　steve@hbsslaw.com
　　　　　　　　　　　　　　　　　　　jerrodp@hbsslaw.com

　　　　　　　　　　　　　　　　　　　Jennifer Fountain Connolly (*pro hac vice*
　　　　　　　　　　　　　　　　　　　forthcoming)
　　　　　　　　　　　　　　　　　　　HAGENS BERMAN SOBOL SHAPIRO LLP
　　　　　　　　　　　　　　　　　　　1701 Pennsylvania Ave. NW, Suite 300
　　　　　　　　　　　　　　　　　　　Washington, D.C. 20006
　　　　　　　　　　　　　　　　　　　202.248.5403 (telephone)
　　　　　　　　　　　　　　　　　　　202.580.6559 (facsimile)
　　　　　　　　　　　　　　　　　　　jenniferc@hbsslaw.com

010698-11 975397 V1

Marc R. Stanley (*pro hac vice* forthcoming)
Martin Woodward (*pro hac vice* forthcoming)
STANLEY LAW GROUP
6116 N. Central Expressway, Suite 1500
Dallas, Texas 75206
214.443.4300 (telephone)
214.443.0358 (facsimile)
marcstanley@mac.com
mwoodward@stanleylawgroup.com

*Attorneys for Plaintiff and the Proposed Class*

010698-11 975397 V1